Filed 3/5/14  P. v. Reyes CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G048069 |
| v. | (Super. Ct. No. 10CF1242) |
| ROBERTO JACOBO REYES, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Richard F. Toohey, Judge.  Affirmed.

Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Scott C. Taylor and William M. Wood, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury convicted defendant Roberto Jacobo Reyes of one count of forcible lewd act on a child under age 14 (Pen. Code, § 288, subd. (b)(1); count 1),[1] two counts of lewd act on a child under age 14 (§ 288, subd. (a); counts 2 & 6), and three counts of first degree residential burglary (§§ 459, 460, subd. (a)); counts 3, 4 & 5). The jury found defendant, in committing the lewd acts (counts 1, 2 & 6), committed first degree burglary and there was more than one victim (§ 667.61, subds. (a), (e)).

In a bifurcated trial, the court found true the People's allegations defendant had suffered a prior strike conviction (§§ 667, subds. (d), (e)(1), 1170.12, subds. (b), (c)(1)), a prior serious felony conviction (§ 667, subd. (a)), and a prior prison term conviction (§ 667.5, subd. (b)). The court exercised its discretion pursuant to section 1385 to strike defendant's prior strike conviction.

The court sentenced defendant to a prison term of 25 years to life on the forcible lewd act conviction in count 1 with five years added for the prior serious felony conviction; and to concurrent terms for the remaining two lewd act convictions and the burglary convictions in counts 3 and 4. The court stayed execution of sentence on count 5 and on the prior prison term.

On appeal defendant argues (1) the court erred by instructing the jury with CALCRIM Nos. 1110 and 1111, (2) he was wrongly questioned by the police without *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) warnings, and (3) Evidence Code section 1108 and CALCRIM No. 1191 are unconstitutional. We affirm.

FACTS

*Count 1*

On the night of February 19, 2010, 11-year-old J.R. (who lived in a ground floor apartment in Santa Ana) was asleep in bed. She awoke and saw a man next to her.

---

[1] All statutory references are to the Penal Code unless otherwise stated.

2

The man was touching her breasts and "bottom part" over her pajamas. He held one hand over her mouth so she could not scream. He kissed her cheek, smelling of beer.

J.R. pushed and kicked the man. He let go. As J.R. ran away, she saw the man jump out the bedroom window, which had been closed when she went to bed. J.R. went to another room and woke her sister, who came in the bedroom and saw that the window was wide open and the screen was down.

J.R. told the police that the man was dark-complected and had short combed back black hair, a moustache, and wrinkled hands. An officer observed the bedroom window was open and was missing a screen.

A forensic scientist could not exclude defendant as the contributor of the male DNA on the chest area of J.R.'s pajamas and on her bedroom window. The DNA profile was "more rare than one in one trillion unrelated individuals."

*Count 2*

On the night of January 23, 2010, 13-year-old H.V. (who lived in a single story residence in Santa Ana) was awakened by someone touching her thigh outside her pajamas. She saw a man's silhouette. She screamed and then heard him run out to the patio.

H.V. went to her mother's room and phoned the police. The kitchen and patio doors were open, although they were normally closed at night. A police officer observed no signs of forced entry and concluded the intruder might have entered through the sliding glass door.

*Count 3*

On the early morning of October 24, 2009, 19-year-old T.P. (whose bedroom was on the ground floor of a two-story house in Santa Ana) was awakened by someone touching the skin of her lower leg. (Previously, her younger niece, who is about

3

nine years younger than T.P., had slept in that bedroom.)  T.P. saw the silhouette of a man standing at the foot of her bed.  He might have been Hispanic with a moustache.  She kicked.  He fled out the window.  T.P. ran to her sister's room and called the police.

T.P. told the responding officer that the man had touched her thighs and her arms.  The officer found a beach chair and a cooler outside under the bedroom window, along with the window screen.  T.P. testified those items were probably normally in the back yard, but not under the window.

*Count 4*

On the night of July 12, 2009, G.P. (who lived in a single story house in Santa Ana) was asleep in a bed with her boyfriend when she was awakened by someone touching her foot.  She saw a shorter, dark-skinned man leaning the upper half of his body into the bedroom through the open window and reaching out his arm to caress her foot.  She screamed and the man ran out into the backyard.

*Counts 5 and 6*

On the night of January 11, 2009, nine-year-old A.Q. (who shared a bedroom with her sisters in a single story house in Santa Ana) woke up because her bedroom was very cold due to an open window, even though she always shut the windows.  (She told the responding officer that she had been awakened by someone tickling her, but at trial she did not recall feeling any tickling.)  She saw a male standing in her room and pulling off her blankets.  She screamed.

The man jumped out a window and over a wall.  The police were called.  The responding officer observed an open window that had no screen in the den connected to A.Q.'s room.  Defendant's fingerprints were found on the interior side of the window.

4

*Police Interview of Defendant*

Detective Edward Zaragoza testified at trial to the following. On May 17, 2010, he contacted defendant's wife at the couple's residence in Santa Ana and learned defendant's work address. Zaragoza contacted defendant at his place of work. Defendant is a 5 feet 5 inches tall, heavy-set Hispanic man with black hair and a moustache. He is a landscaper and has calloused palms.

Zaragoza asked defendant to voluntarily come with him to the police station. Defendant said, "He who owes nothing fears nothing," and agreed to go with the officer. Defendant was not handcuffed or under arrest when interviewed at the police station.

During the interview, defendant identified his friend's house in Santa Ana and the nearby El Fracaso Bar as places that he frequented. Defendant's then-current residence, his prior residence, the El Fracaso Bar, his friend's house, and the homes of J.R., H.V., T.P., G.P., and A.Q. were all located within an approximately mile square area in Santa Ana.

When Zaragoza told defendant that his DNA had been found at a crime scene, defendant initially denied it, but eventually admitted he had gone there to see a little girl. He stated he removed the window screen and bit it with his teeth, which was why his DNA was found there. He eventually admitted he had entered the residence to touch the girl, sat on the bed, touched her breasts and vagina area, and left when she awoke.

Defendant said he likes to touch or caress little girls all over their bodies. He said he would leave when the girls woke up. He acknowledged that on the night of May 5, 2010, he had entered a residence, but left when he found a light on. He also admitted entering a residence in 2000 and touching a girl's fingers. He did not know why he enters girls' bedrooms, but said he got goose bumps as he was doing it. He knew that it was wrong. He did not get an erection or masturbate during these incidents. He would

5

enter through open windows after removing screens or through open doors. When he noticed an attractive girl, he would note the location so he could return there later. He does not like girls any younger than age 12. He admitted entering two or three other residences in the mile square area to look at and touch girls.

*Uncharged Conduct*

On the night of November 3, 2002, 20-year-old N.H. (who lived in a single story house in Santa Ana) awoke to find defendant standing in her bedroom. She screamed and chased defendant out of the house. The screen on the kitchen window was ripped, the kitchen window had been broken into, and porcelain bowls had been moved from the window area to the outside.

On or around the night of May 14, 2000, 12-year-old C.M. (who shared a bedroom with her sister in a single story home in Santa Ana) woke and saw a short person standing at the foot of her bed. She thought it was her cousin playing a prank on her, so she went back to sleep. She woke again when she felt someone lightly touching her fingertips. The man put his hand under the blankets and touched her leg. She stood up. The man put his hands by her face like he wanted to kiss her. She said, "What are you doing?" He ran out. C.M. tried to wake up her sister, but her sister would not wake up, so C.M. fell back asleep. She told an adult about it the next morning when she realized that her cousins had not spent the night. The window on the kitchen door had been removed and placed on the washing machine. One and one-half years later, on January 13, 2002, a relative saw someone outside the house looking into C.M.'s window. The police detained defendant. C.M., who was then 14 years old, told an officer that she recognized defendant as the intruder from the earlier incident.

On the night of July 17, 2001, seven-year-old T.T. (who lived in a single story home in Santa Ana) woke when she heard the bedroom door opening. She saw a silhouette in the doorway and, thinking it was her father, called out, "Dad?" The person

6

ran away.  The next morning, T.T.'s father found a broken window and a footprint on the carpet.  Defendant's fingerprints were on a piece of broken window glass and the exterior of the broken window.

DISCUSSION

*The Court Did Not Err by Giving CALCRIM No. 1110*

The court instructed the jury on lewd acts on a child under 14 years old with a modified version of CALCRIM No. 1110 as follows:  "The defendant is charged in count[s 2 and 6] with committing a lewd or lascivious act on a child under the age of 14 years in [violation of Penal Code section 288(a)].  [¶]  To prove that the defendant is guilty of this crime, the People must prove that:  [¶]  [1A. The defendant willfully touched any part of a child's body either on the bare skin or through the clothing;]  [¶]  2. The defendant committed the act with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of [himself] or the child; [¶] AND [¶] 3. The child was under the age of 14 years at the time of the act.  [¶]  The touching need not be done in a lewd or sexual manner.  [¶]  Someone commits an act willfully when he does it willingly or on purpose. . . .  [¶]  Actually arousing, appealing to, or gratifying the lust, passions, or sexual desires of the perpetrator or the child is not required."

Section 288, subdivision (a) provides that "any person who willfully and lewdly commits any lewd or lascivious act . . . upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child, is guilty of a felony . . . ."

Defendant contends that CALCRIM No. 1110's instruction that the "touching need not be done in a lewd or sexual manner" conflicts with section 288, subdivision (a)'s express requirement that the defendant have "lewdly" committed the

7

lewd act.  Defendant is wrong.  CALCRIM No. 1110's instruction that the "touching need not be done in a lewd or sexual manner" conforms with section 288, subdivision (a), as it has been interpreted by our Supreme Court.  Most recently, in *People v. Shockley* (2013) 58 Cal.4th 400, our high court reiterated that "'[a]ny touching of a child under the age of 14 violates [section 288, subdivision (a)], even if the touching is outwardly innocuous and inoffensive, if it is accompanied by the intent to arouse or gratify the sexual desires of either the perpetrator or the victim.'  [Citation.]  By focusing on the defendant's intent to sexually exploit a child rather than on the nature of the defendant's offending act, section 288 'assumes that young victims suffer profound harm whenever they are perceived and used as objects of sexual desire.'"  (*Id.* at p. 404.)

But defendant further argues CALCRIM No. 1110 is confusing because its statement that the touching need not be done in a lewd manner contradicts its express requirement that the act be committed with a lewd intent.  But the instruction clearly states that the defendant must commit the act with the requisite *intent*, but need not do so in a lewd *manner*.  Defendant relies on *People v. Cuellar* (2012) 208 Cal.App.4th 1067.  While *Cuellar* found the same language in CALCRIM No. 1120 to be "unfortunate and possibly confusing" (*Cuellar*, at p. 1071), it did not go so far as to hold it was error to have given it (*id*. at p. 1072).  And the contrary conclusion was reached in *People v. Sigala* (2011) 191 Cal.App.4th 695, 700.  Although the Judicial Council of California has responded to the *Cuellar* court's criticism by excising the criticized sentence, thereby removing the potential ambiguity identified in *Cuellar*, we nevertheless conclude the instruction given here was sufficiently clear.  Furthermore, defense counsel did not request a clarification to CALCRIM No. 1110, thereby waiving the issue on appeal.  (*People v. Kelly* (1992) 1 Cal.4th 495, 535 [trial court has no sua sponte duty to revise or improve accepted and correct jury instructions]; *People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1331 [trial court has no sua sponte duty to give clarifying or amplifying instructions]; *People v. Lewis* (2009) 46 Cal.4th 1255, 1315, fn. 43

8

[defendant's failure to object to instructional error below waives issue on appeal unless claim raises issues concerning substantial rights].)

*CALCRIM Nos. 1110 and 1111 Are Not Impermissibly Argumentative*

The court instructed the jury with CALCRIM Nos. 1110 (lewd act on a child under age 14) and 1111 (forcible lewd act on a child under age 14), which state that "[a]ctually arousing, appealing to, or gratifying the lust, passions, or sexual desires of the perpetrator or the child is not required."[2]

Defendant argues this statement is duplicative. We disagree. The challenged statement is not duplicative of any other language in either instruction. Defendant merely asserts, without any supporting legal authority, that when an instruction states "what must be proved, further instruction on what need not be proved is duplicative." Defendant's assertion is overbroad. Here, the challenged statement refined and clarified the instructions without being duplicative.

Defendant further argues the challenged statement is impermissibly argumentative and improperly diminished the weight of the evidence. He points out there was evidence he experienced no sexual arousal from touching the girls — e.g., he told the police he did not experience an erection, but merely goose bumps, when he touched the victims — and asserts such evidence that he was not sexually aroused was relevant to whether he touched them with the intent to arouse his own lust, passions, or sexual desires. He asserts the instructions' statement that no actual sexual arousal is required (1) improperly diminished the weight of such evidence on the issue of his intent and (2)

---

[2]     CALCRIM No. 1111 is substantially similar to CALCRIM No. 1110, but contains the further element that the defendant must have committed the act by using "force, violence, duress, menace, or fear of immediate and unlawful bodily injury to the child or someone else."

argumentatively invited the jury *not* to draw inferences favorable to him from such evidence.

We reject defendant's assertion. As defendant concedes, the challenged passage (that actual arousal or gratification is not required) is a correct statement of law. (*People v. McCurdy* (1923) 60 Cal.App. 499, 502; *People v. Martinez* (1995) 11 Cal.4th 434, 444.) Furthermore, the instructions properly informed the jurors they could convict defendant only if they found he "committed the act with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of [himself] or the child." We must presume the jurors found defendant harbored the requisite intent based on the evidence, after according the evidence the weight they felt it deserved. "'Jurors are presumed to be intelligent, capable of understanding instructions and applying them to the facts of the case.'" (*People v. Lewis* (2001) 26 Cal.4th 334, 390.) The jurors were not required to believe defendant's assertion that he experienced no sexual arousal. Moreover, the requisite intent is not limited to sexual arousal, but rather encompasses lust and passions as well. Nor did the instructions argumentatively invite the jury to draw inferences favorable to the People from specified items of evidence on the issue of intent. (See *People v. Flores* (2007) 157 Cal.App.4th 216, 220.)

*Defendant Was Not in Custody When Questioned by the Police*

Defendant contends his self-incriminating statements to the police were made during a custodial interrogation without benefit of *Miranda* warnings. We disagree.

Prior to trial, the court ruled defendant's statements were not custodial based on Detective Zaragoza's preliminary hearing testimony (as submitted to by the parties) and the parties' filings. Zaragoza testified at the preliminary hearing as follows. He learned that defendant was a possible suspect in the J.R. incident based on a DNA match. Zaragoza went with three or four other officers to defendant's work location to

contact defendant.  The officers wore a modified police uniform consisting of a polo shirt that said "Investigations City of Santa Ana."

Defendant was in a group of landscaping laborers.  The officers arrived in possibly three unmarked cars, but only two of the cars parked behind the laborers' work truck.

Zaragoza alone approached the workers and asked to speak with Roberto Reyes.  Defendant stepped forward from the group.  Zaragoza asked if they could speak privately.  They moved away from the other workers.  Zaragoza's partner eventually joined them.  The conversation lasted for mere seconds.  Zaragoza told defendant he wanted to ask him questions about a crime.  Zaragoza did *not* identify what the crime was or its date.  He did *not* mention DNA evidence.  Zaragoza asked defendant to come back to the police station for an interview.  Defendant agreed to go.

Defendant was *not* under arrest and *not* in handcuffs.  Two other detectives were in the car when Zaragoza drove defendant to the station.  Zaragoza did *not* talk with defendant in the car on the way to the interview.

The interview took place on the third floor of the police station.  Zaragoza, who is a Spanish speaker, spoke to defendant in Spanish.  Zaragoza informed defendant he was not under arrest, he did not have to answer any questions, and he was free to leave at any time.  Defendant said he understood.  He did not appear to be under the influence of drugs or alcohol.  The interview lasted well over one hour.

At trial Zaragoza testified about statements defendant made during the interview.  Defendant contends the court improperly admitted the evidence because the interview was custodial.

"An interrogation is custodial, for purposes of requiring advisements under *Miranda*, when 'a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'  [Citation.]  Custody consists of a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest.

11

[Citations.] When there has been no formal arrest, the question is how a reasonable person in the defendant's position would have understood his situation. [Citation.] All the circumstances of the interrogation are relevant to this inquiry, including the location, length and form of the interrogation, the degree to which the investigation was focused on the defendant, and whether any indicia of arrest were present." (*People v. Moore* (2011) 51 Cal.4th 386, 394-395 (*Moore*).) But *Miranda* warnings are not required "simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." (*Oregon v. Mathiason* (1977) 429 U.S. 492, 495.) "While the nature of the police questioning is relevant to the custody question, police expressions of suspicion, with no other evidence of a restraint on the person's freedom of movement, are not necessarily sufficient to convert voluntary presence at an interview into custody." (*Moore*, at p. 402.)

"'Whether a defendant was in custody for *Miranda* purposes is a mixed question of law and fact. [Citation.] When reviewing a trial court's determination that a defendant did not undergo custodial interrogation, an appellate court must "apply a deferential substantial evidence standard" [citation] to the trial court's factual findings regarding the circumstances surrounding the interrogation, and it must independently decide whether, given those circumstances, "a reasonable person in [the] defendant's position would have felt free to end the questioning and leave" [citation].'" (*Moore*, *supra*, 51 Cal.4th at p. 395.)

In *People v. Chutan* (1999) 72 Cal.App.4th 1276, 1282 (*Chutan*), this court found the defendant was not in custody for purposes of *Miranda* when he "was invited to the police station and expressly told he was not under arrest" (*id*. at p. 1282) and the detectives did not do or say "anything that might cause a reasonable person to believe he was in custody or otherwise deprived of his freedom . . . ." (*id.* at p. 1283).[3]

_____

[3] The finding in *Chutan* was also based on the fact that, after the defendant gave his statement, he was driven home by the police. (*Id*. at p. 1282.) The police in

12

Similarly, in *Bains v. Cambra* (9th Cir. 2000) 204 F.3d 964, the defendant "'voluntarily' accompanied the police to the police station" (*id*. at pp. 972-973) and "was questioned by several police officers, who in fact had lied to him" about incriminating statements made about him (*id*. at p. 973). The court found no evidence to suggest that "a reasonable person . . . would have felt that he was not free to terminate the police interrogation," and therefore *Miranda* requirements were not triggered. (*Ibid.*)

Here, defendant "was asked — and freely agreed — to come to the [police] station . . . ." (*Moore*, *supra*, 51 Cal.4th at p. 402.) He was not handcuffed or placed under arrest. There is no evidence he was told he was a suspect in a crime. At the outset of the interview, Zaragoza expressly told defendant he was not under arrest, did not have to answer questions, and was free to leave at any time. Defendant confirmed he understood. There is no evidence the interview was forceful. The interview took over one hour, but covered a number of incidents. In sum, we find no evidence suggesting a reasonable person under these circumstances would have believed he or she was not free to terminate the interview.

Defendant argues this case is similar to *Tankleff v. Senkowski* (2d Cir. 1998) 135 F.3d 235 (*Tankleff*). The defendant there, Martin Tankleff, was a 17-year-old who phoned 911 to report that someone had murdered his parents in the family's house. (*Id.* at p. 240.) Shortly after the police arrived at the residence, an officer instructed Tankleff to leave the house and go to a police car. (*Ibid.*) A "series of homicide detectives interviewed Tankleff near the police cars" without giving him *Miranda* warnings. (*Ibid.*) The detectives noted inconsistencies in Tankleff's accounts and decided to take him to police headquarters for further questioning. (*Ibid.*) Tankleff agreed to go to the police station and was questioned during the 40-minute drive. (*Ibid.*)

*Chutan*, however, had specifically promised prior to the interview that they would give the defendant a ride home. (*Id.* at p. 1279.)

13

At the station, the police subjected Tankleff to increasingly hostile questioning, during which the detectives accused him of showing insufficient grief, said his story was "'ridiculous' and 'absurd,'" and added they simply "'could not accept' his explanations." (*Tankleff*, *supra*, 135 F.3d at p. 244.) After two hours of this questioning, a detective left the interview room and in a loud voice faked a telephone call. (*Id.* at p. 241.) The detective returned to the interview room and falsely told Tankleff that the phone call had been about Tankleff's father coming out of a coma at the hospital and accusing Tankleff. (*Ibid.*)

The Second Circuit examined whether a reasonable person in Tankleff's position would have felt free to terminate the interrogation and leave, and whether the officers acted or spoke in a manner that conveyed the message that they would not permit him to leave. (*Tankleff*, *supra*, 135 F.3d at pp. 243-244.) Relevant factors included "whether a suspect is or is not told that she is free to leave [citation]; the location and atmosphere of the interrogation [citation]; the language and tone used by the police [citation]; whether the suspect is searched, frisked, or patted down [citation]; and the length of the interrogation [citation]." (*Id.* at p. 244.) Based on the totality of the circumstances, the Second Circuit court held Tankleff was in custody at least by the point when the detective falsely said Tankleff's father had woken from a coma and had accused him. (*Id.* at p. 244.)

Clearly, *Tankleff* bears scant similarity to the case at hand and provides no support for defendant's contention his interview was custodial.

Defendant also relies on *Missouri v. Seibert* (2004) 542 U.S. 600, 622, but that case is inapposite, as it was a midstream *Miranda* case, where law enforcement interviewed the defendant before and after the giving of *Miranda* warnings and used a two-step interrogation technique "in a calculated way to undermine the *Miranda*

14

warning," and the issue was whether the defendant's postwarning statements were admissible. (*Id.* at p. 622 (conc. opn. of Kennedy, J.).)[4]

The court did not err in ruling defendant's interview was not custodial.

*Evidence Code Section 1108 Is Constitutional*

Defendant contends Evidence Code section 1108 violates both the due process and equal protection clauses of the federal Constitution. Evidence Code section 1108 makes admissible any evidence of a defendant's uncharged sexual misconduct *if* the evidence is admissible under Evidence Code section 352.

As to defendant's due process contention, we are bound by *People v. Falsetta* (1999) 21 Cal.4th 903, where our Supreme Court held Evidence Code "section 1108 is constitutionally valid" because, although it "represents a deviation from the historical practice of excluding such 'propensity' evidence [citation], the provision preserves trial court discretion to exclude the evidence if its prejudicial effect outweighs its probative value [citation]." (*Id.* at p. 907.)

As to the equal protection clause, defendant argues Evidence Code section 1108 is unconstitutional "because it discriminates between those who commit sexual offenses and those who commit other crimes and is not narrowly tailored to achieve a compelling governmental interest." We independently review defendant's equal protection challenge (*Samples v. Brown* (2007) 146 Cal.App.4th 787, 799) and

---

[4] "Because Justice Kennedy 'concurred in the judgment[] on the narrowest grounds' [citation], his concurring opinion represents the *Seibert* holding." (*People v. Camino* (2010) 188 Cal.App.4th 1359, 1370.)

Defendant also relies on *People v. Boyer* (1989) 48 Cal.3d 247, 272, but that case was disapproved by *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1, to the extent *Boyer* suggested "that an officer's subjective focus of suspicion is an independently relevant factor in establishing custody for the purposes of *Miranda* . . . ."

15

presume the statute "is constitutional unless its unconstitutionality clearly, positively, and unmistakably appears" (*People v. Falsetta*, *supra*, 21 Cal.4th at p. 913).

"An equal protection challenge to a statute that creates two classifications of accused or convicted defendants, without implicating a constitutional right, is subject to a rational-basis analysis." (*People v. Fitch* (1997) 55 Cal.App.4th 172, 184.) Evidence Code section 1108 does *not* implicate a constitutional right since it does not violate the due process clause. Applying the rational basis test, we agree with *Fitch* that Evidence Code section 1108 withstands scrutiny. "The Legislature determined that the nature of sex offenses, both their seriousness and their secretive commission which results in trials that are primarily credibility contests, justified the admission of relevant evidence of a defendant's commission of other sex offenses. This reasoning provides a rational basis for the law. . . . In order to adopt a constitutionally sound statute, the Legislature need not extend it to all cases to which it might apply. The Legislature is free to address a problem one step at a time or even to apply the remedy to one area and neglect others." (*Fitch*, at pp. 184-185.)

*CALCRIM No. 1191 Is Constitutional*

The court instructed the jury with CALCRIM No. 1191 as follows: "The People presented evidence that the defendant committed offenses that were not charged in this case. . . . [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant, in fact, committed the uncharged offenses. . . . A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. [¶] . . . [¶] If you decide that the defendant committed the uncharged offenses, you may, but are not required, to conclude that from that evidence that defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit the charged sex offenses as charged here. If you conclude that the defendant

16

committed the uncharged offenses, that conclusion is only one factor to consider along with all the other evidence.  It is not sufficient by itself to prove that the defendant is guilty of the charged sex offenses.  The People must still prove each charge and allegation beyond a reasonable doubt.  [¶]  Do not consider this evidence for any other purpose."

Defendant contends CALCRIM No. 1191 violates the due process clause of the federal Constitution because its wording makes "it reasonably probable that at least some jurors would believe that they could decide [his] guilt based upon their determination that he committed a prior offense under the preponderance of the evidence standard."  But defendant acknowledges that we are bound by our Supreme Court's holding in *People v. Reliford* (2003) 29 Cal.4th 1007, where our Supreme Court rejected a challenge to a CALJIC instruction similar to CALCRIM No. 1191.  (*Id*. at p. 1012.)  "Although the instruction considered in *Reliford* was the older CALJIC No. 2.50.01, there is no material difference in the manner in which each of the instructions allows the jury to conclude from the prior conduct evidence that the defendant was disposed to commit sexual offenses and, therefore, likely committed the current offenses.  CALCRIM No. 1191, as given here, cautions the jury that it is not required to draw these conclusions and, in any event, such a conclusion is insufficient, alone, to support a conviction.  Based on *Reliford*, we therefore reject defendant's contention that the instruction violated his due process rights."  (*People v. Cromp* (2007) 153 Cal.App.4th 476, 480.)

17

DISPOSITION

The judgment is affirmed.


                                    IKOLA, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


THOMPSON, J.